## Case No. 17,398.

WELLS v. JACQUES et al.

[1 Ban. & A. 60: [1] 5 O. G. 364.]

Circuit Court, D. New Jersey. Feb. 21, 1874.

PATENTS — CONSTRUCTION OF CLAIMS—REISSUES—
CONCLUSIVENESS OF COMMISSIONER'S ACTION—
COMBINATIONS—INFRINGEMENT—EQUITY SUITS—
JOINDER OF DEFENDANTS.

1. A patentee is entitled to all the legitimate results of his invention, and it is not necessary that he fully comprehended the extent of his improvement, or the capabilities of his machine, in order to give to him, and those claiming under him, all the rights and benefits of his invention.

[Cited in Thomson Meter Co. v. National Meter Co., 12 C. C. A. 673, 65 Fed. 429.]

2. Every inventor is entitled to the benefit of all that he invents, and if, from inadvertency or mistake, and not from fraud in drawing the specifications or claims of his patent, he fails to acquire a right to his whole invention, he may surrender and have a reissue of the patent, from time to time, until his specifications and claims cover the whole ground.

3. The decision of the commissioner of patents, in awarding a reissue, cannot be reviewed in a suit brought for infringement of the reissued patent, unless it is apparent upon the face of the reissue, that there is such a repugnancy between the old and the reissued patent, that the court can hold, as a matter of legal construction, that they are not the same invention. Citing Seymour v. Osborne, 11 Wall. [78 U. S.] 543.

4. A patentee may claim a combination of mechanical elements, which of themselves will not produce a new and useful result, when his specification shows how the patented combination used with or supplemented by other devices and instrumentalities therein described, will produce such result.

[Followed in Roberts v. H. P. Nail Co., 53 Fed. 920.]

5. The separate claims of a patent must be construed in reference to the specification, and a claim for a combination which will produce a useful result only by co-operation with other mechanism or instrumentalities, the nature and operation of which is described in the specifications, is valid.

6. Where there is privity or connection between the different defendants, they are jointly liable upon a bill for infringing a patent.

7. The rule in equity, that two or more distinct subjects cannot be embraced in the same suit, does not apply to a suit for the infringement of a patent, brought against two defendants, one of whom was the owner of the infringing machines, and the other the lessee of the machines from such owner. Such a relationship created a privity between them, which made it proper to embrace them in the same suit.

8. Suit was brought for infringement of complainant's patent, as it existed prior to its last reissue. The defendant was using a machine known as the Boyden machine. The suit went to the supreme court, which held that the use of the Boyden machine was not an infringement of the complainant's patent as it then existed. The complainant subsequently surrendered the patent and obtained a reissue, and then brought the present suit for the infringement of the reissued patent, against users of the same Boyden machine. *Held*, that the defendants were not protected in the use of the Boyden machine by the decree in the former suit, which was tried and decided in reference to the patent as it then existed, and that they must now test their right to use it as against the complainant's reissued patent, as it now exists.

9. A hat-body machine, in which it is claimed that the fur is projected by a rotary picker downward against a surface, by which it is guided upon a former, is an infringement of a patent for a like machine, in which the fur is blown by such a picker upward against the upper side of a tunnel through which it is carried on the former.

[This was a bill in equity by Eliza Wells against Henry H. Jacques and others for infringement of a patent.]

Edward N. Dickerson, for complainant.

Cortlandt Parker, for defendants.

NIXON, District Judge. The complainant files her bill against the defendants for the infringement of a patent originally granted to Henry A. Wells, April 25th, 1846, for a new and useful improvement in machinery for making hat-bodies, which patent was extended to the complainant, by an act of congress for seven years from the 25th of April, 1867, and was by her surrendered and reissued May 19th, 1868.

The large amount of litigation in the courts for several years past in regard to this patent, is, perhaps, the best evidence that can be had of its value in the art of making hat-bodies. Useless inventions are not ordinarily infringed; or, if they are, not enough interest is involved in them to induce the owners to spend their money and time in protecting them against the infringement. But it is not too much to say that the Wells patent revolutionized the mode of forming fur hat-bodies; that, upon its introduction the anterior slow and expensive process of "bowing," in which the workman snapped the string of a bow upon the mass of loose fur to throw it upon the bat, was almost at once superseded; and that since then the Wells machine under its numerous re-

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]

issues, or other machines with such variations in their mode of operation as to produce the same result by the use of substantially different means, as their owners allege, or by the use of substantially the same means, as the owner of the Wells patent claims, have supplied the trade with a cheap and complete fur hat-body, with the deposit of the fur so graduated and controlled as to defy all competition by any other methods of formation known in the art.

The pleadings and proofs in this case present two questions for consideration: (1) What is the Wells patent, and what is the complainant entitled to claim and hold under it? (2) Do the machines used by the defendants infringe any of these claims?

1. Mr. Wells calls his invention "an improvement in machinery for making hat-bodies," thus recognizing the existence of other machinery which was in use in efforts to accomplish the same result.

It is alleged that it does not clearly appear from his descriptions that he fully comprehended the extent of his improvement or the capabilities of his machine. But it is not necessary that he should, in order to give to him, and those claiming under him, all the rights and benefits of his invention. Whatever are the necessary and legitimate results of an invention—whether the patentee comprehends them all or not—belong to him when he has complied with the requirements of the patent law, to protect him in its enjoyment and use against infringement.

His patent was for a combination—a combination of old and well-known mechanical devices to produce a new and useful result. In his schedule to the original patent he says—

"My improvements consist in feeding the fur (called the stock), after it has been picked, to a rotating brush between two endless belts of cloth, one above the other, the lower one horizontal and the upper inclined, to gradually compress the fur and gripe it more effectually when it is presented to the action ·of the rotating brush, which, moving at a great velocity, throws it in a chamber or tunnel, which is gradually changed in form toward the outlet, where it assumes a shape nearly corresponding to the vertical section passing through the axis of the cone, but narrower, for the purpose of concentrating and directing the fur thrown by the brush into the cone—this casing being provided with an aperture immediately under the brush, through which a current of air enters, in consequence of the rotation of the brush and the exhaustion of the cone, for the purpose of more effectually directing the fibres toward the cone, which is placed just in front of the delivery aperture of the chamber or tunnel, which aperture is provided at top with a bonnet or hood hinged thereto, and at the bottom with a hinged flap, to regulate the deposits of the fibres on the cone or other former, with the view to distribute the thickness of the bat wherever more is required to give additional strength."

This sentence reveals what was in the inventor's mind—a combination of machinery to produce, not a fur hat-body merely, but one with a regulated distribution of the fur on the cone, in the process of formation, giving, as he afterward states, "greater thickness in the parts of the hat which form the brim and edge or square of the top than on the top and crown."

The combination which he formed to accomplish this result was (1) an apron or endless belt; (2) revolving rollers; (3) a rotating brush or picker; (4) a chamber or tunnel with a hinged flap or hood; (5) a perforated revolving cone; and (6) an exhausting apparatus to produce a current by exhausting the air under the cone. After describing their relations to each other and their methods of operation and combination, he states his claim as follows:

"What I claim as my invention and desire to secure by letters patent in the machine above described, is the arrangement of the two feeding belts, with their planes inclined to each other and passing around the lips formed substantially as described, the better to present the fibres to the action of the rotating brush, as described, in combination with the rotating brush and tunnel or chamber, which conducts the fibres to the perforated cone or other former placed in front of the aperture or mouth thereof, substantially as herein described. I claim the chamber into which the fibres are thrown, in combination with the perforated cone or other former placed in front of the delivery aperture thereof, for the purpose and in the manner substantially as herein described; the said chamber being provided with an aperture below and back of the brush for the admission of a current of air to aid in throwing and directing the fibres on to the cone or other former, as described. I also claim the employment of the hinged hood, to regulate the distribution of the fibres on the perforated cone or other former, as described. And I also claim providing the lower part or delivery aperture of the tunnel or chamber with a hinged flap, for the purpose of regulating the delivery of the fibres to increase the thickness of the bat where more strength is required, as herein described, in combination with the hood, as herein described. And in the process I claim hardening the bat while on the perforated cone or former, and preparatory to its removal therefrom, by immersing it in hot water, as herein described. I also claim covering the bat with felted or fulled cloth, before it is removed from the cone or former, as described. And, finally, I claim the employment in combination of both the perforated cones, one for making pressure on and retaining the fibres of the bat until hardened, and the other to prevent the collapse of the cone or other former on which the hat is formed, substantially as herein described."

It is quite obvious to any one familiar with the controversies in the courts to which the owners of the Wells patent have been par-

ties, that these controversies have been aggravated, if not caused, by the defective manner in which the patentee specified his invention and stated his claims in the original patent. It is no imputation upon Mr. Wells to say this, for an examination of his two caveats, filed in the patent office—one on the 25th of June, 1838, and the other on the 9th of October, 1844 —show that the invention was with him, not an inspiration, but a growth, proceeding from his mind—not life-sized and full armed like Minerva from the brain of Jupiter—but by slow and patient development, like the work of the sculptor from the rough marble.

The owners of the patent were not slow in discovering these defects and in attempting to remedy them. Availing themselves of the provisions of the act which authorize a surrender when a patent was found to be inoperative or invalid by reason of defective or insufficient specification or claim, and the error arose from inadvertence, accident, or mistake, and not from a fraudulent intention, this patent was surrendered and reissued on what was supposed to be amended and corrected specifications in two separate letters patent, one of which bore date September 30, 1856, and the other October 7, 1856, and which are designated reissues Nos. 396 and 400, respectively. These not proving satisfactory to the owners, another surrender was made and two new reissues had on the 4th of December, 1860—one numbered 1,086, for a process, and the other, numbered 1,087, for machinery.

It was under these reissues that the suit of Burr v. Duryee, so fully reported in 1 Wall. [68 U. S.] 531, was brought; and the decision of the court in that case, and the statement of the principles on which it rested, most probably induced the complainant, after the extension of the patent by act of congress, March 2, 1867, to again surrender the reissued letters patent No. 1,087, to the commissioner, and to obtain a new reissue, which was dated May 19th, 1868, and numbered 2,942, and on which the present action was commenced against these defendants.

In this last reissue no claim was made for the invention of "the mode of operation" of the machine, which had subjected the reissue of 1860 to so much criticism in the courts, but her claims are stated as follows:

"1. The combination of the rotating brush or picker, substantially such as described; the rotating pervious cone, provided with an exhausting mechanism. substantially as described; and the bottom plate or guide, substantially as described, for directing the fur fibres towards the lower part of the cone, and preventing the fibres going to waste, the said combination having the mode of operation specified, and for the purpose set forth.

"2. The combination of the feed-apron, the rotating brush or picker, substantially as described; the rotating pervious cone, provided with an exhausting mechanism, substantially as described; and the guide or deflector for directing the fur fibres on to the tip and upper part of the cone, substantially as described, the said combination having the mode of operation specified, and for the purpose set forth.

"3. The combination of the rotating brush or picker, substantially as described; the rotating pervious cone, provided with an exhausting mechanism, substantially as described; and the side guides, or either of them, substantially as described, to prevent fur fibres from getting out of the proper influence of the currents travelling to the cone. and to protect the travelling fibres from disturbing currents, the said combination having the mode of operation specified, and for the purposes set forth.

"4. The combination of the feeding-apron, on which the fur can be placed in separate batches, as described; the rotating brush or picker, substantially as described; the rotating pervious cone or former, provided with an exhausting mechanism, substantially as described, the said combination having a mode of operation substantially as described.

"5. The combination of the feed-apron, on which the fur fibres can be placed in separate batches, each in quantity sufficient to make one hat-body; the rotating brush or picker, substantially as described; the rotating pervious cone, provided with an exhausting mechanism; and the devices for guiding the fur fibres, substantially as described, the combination having the mode of operating specified and for the purpose set forth.

"6. In combination with the pervious cone, provided with an exhausting mechanism, substantially as described, the covering cloth, wet with hot water, substantially as and for the purpose specified."

It will be observed that these are all claims for a combination; that none of them presents the concrete machine, except the fifth, and that lacks the "covering cloth wet with hot water," mentioned in the specification of the sixth claim; but they are distinct combinations of the parts of a machine, each part, it is alleged, performing an independent and distinct function. For instance, in the first claim, we have the combination of the brush or picker, the pervious cone with an exhausting mechanism, and the bottom plate or guide for directing the fur fibres toward the lower part of the cone. That does not constitute a machine. It is nothing in itself and standing alone. It is only one of several combinations of devices or instrumentalities that go to make up the complete working machine. The inventor claims that, although the devices are old and may be used by anybody, the combination is new, and that it is a useful improvement in machinery for manufacturing hat-bodies. By such a specification of the separate combinations of the parts, which are used and needed to constitute the aggregate machine. the complainant has endeavored to take her case out of the general rule applicable to patents for a combination alone. to wit, that it is no infringement to use any of the parts or things which go to make up the combination provided the whole combination is not used. It is fairly

to be inferred from the language of Chief Justice Taney in Proutly v. Ruggles, 16 Pet. [41 U. S.] 341, that the difficulties of the plaintiffs in that case arose from not observing some such method in the specifications of their claims. "The patent is for a combination," he said, "and the improvement consists in arranging different portions of the plough and combining them together in the manner stated in the specification for the purpose of producing a certain effect. None of the parts referred to are new, and none are claimed as new, nor is any portion of the combination less than the whole claimed as new, or stated to produce any given result. The end in view is proposed to be accomplished by the union of all, arranged and combined together in the manner described. * * * The use of any two of these parts only, or of two combined with a third, which is substantially different, in form or in the manner of its arrangement and connection with the others, is therefore not the thing patented. It is not the same combination if it substantially differs from it in any of its parts."

But the defendants insist that this last reissue is invalid:

(1) Because it embraces more than Mr. Wells claimed in his original patent.

(2) Because the devices in combination in the different claims cannot be employed alone for any useful purpose; but, only being useful when combined in a complete machine, the patent should have been for a unit and not for the distinct combinations.

(1) With regard to the first objection, it is undoubtedly true that it is not the province or the design of a reissue to enlarge the original right of the inventor, but to cure some defect arising from inadvertency or mistake, and not from fraud, in drawing the specifications or claims of the first patent. Every inventor is entitled to the benefit of all that he invents, and if he fails, for the reason above assigned, to acquire a right to his whole invention in his letters patent, he may surrender them and have a reissue, from time to time, until his specifications and claims cover the whole ground. His application is made to the commissioner of patents, and that officer, not this court, is the tribunal in which congress has vested the power of determining whether sufficient reasons exist to grant the reissue. His decision in the matter is final, in the sense that there is no appeal from it; and it does not seem to be re-examinable here, unless it is evident upon the face of the reissue that he has exceeded his authority, and that there is such a repugnancy between the old and the reissued patent that it must be held, as a matter of legal construction, that they are not the same invention. Seymour v. Osborne, 11 Wall. [78 U. S.] 543.

Conceding, then, that Mrs. Wells was entitled to claim in her reissue all that was included in her husband's first invention, and nothing more, the question recurs: Where is the repugnancy between the new and the old?

It must consist in something added or in something essentially different. What more is included in the new than was fairly indicated and embraced in the old? The experts in the case specify nothing, and the court, upon careful comparison of the two, finds nothing. The surrender was made to correct and amend the specifications and claims. The law gave to the complainant that privilege. In exercising it she has somewhat varied the form of the expressions of some of the devices; as, for instance, the trunk or tunnel and the parts composing it; and in the claims of the reissue has segregated the parts to more fully exemplify their functions and meaning; but I cannot perceive that she has added anything or adapted anything that was not suggested in the original patent.

(2) The second objection to the reissue, divested of all verbiage, amounts to this: That an improvement on a machine is not patentable, unless the improvement, standing alone, and not in connection with some other mechanical devices not enumerated, is practically operative and useful. I cannot yield assent to that proposition. The separate claims of a patent must be construed in reference to the specifications; and if the specifications point out the arrangements to be made or the methods to be adopted in connection with other instrumentalities which the inventor may not claim as new, in order to render his invention practically useful, the test to be applied is not whether the claim alone will produce an useful result, but whether it will do so supplemented by and in connection with such designated devices and instrumentalities.

In the trial at law of the case of the complainant against two of these defendants, Jacques and Duryee, in the circuit court of the United States for New York, before Judge Woodruff and a jury in 1871, the several claims of this reissue were discussed, and his honor was requested to charge the jury, that if they believed that, with reference to the state of the art and the object to be accomplished, the combination described in the first claim would not produce any useful effect, then the patent reissue, which was stated in the plaintiff's declaration, so far as that claim was concerned, was void. He declined to do so, but directed the jury to construe the claim in reference to the specification of the patent, and if they found it would produce a useful result, when employed in the manner described in the specification, it should be regarded as a patentable combination. [Case unreported.]

And in the subsequent case of the complainant against John Gill, the same judge, in charging the jury on the question involved in this objection, further observed:

"An inventor is at liberty, when he has made an invention, if it consists of several distinct, effective, new devices, which, as an aggregate, may constitute, in his judgment, the best machine in the world, but of which certain of the parts may be omitted and it still be an effective, new, and useful machine—I say the

inventor is at liberty, in taking out his patent, to protect himself against that species of innovation by claiming the separate, new, and useful parts of the machine by themselves. Just as, for illustration, was suggested in the discussion by counsel: A party patenting a machine may introduce ingenious and new devices, which may be better than any other for the purpose, but some of which could be supplied by old devices; if he patents the machine and the combination containing his new devices—patents it only as a combination—a party who might think he could make a machine substantially useful for his purposes by omitting these devices and supplying their places by old devices having a different operation and character, would be at liberty to do so, and thus, practically, a large benefit, or perhaps the whole benefit, that is due the inventor might be lost. I say the patent law, therefore, permits the inventor not only to patent the machine as an aggregate, but to patent the new devices which enter into it, so that another may not avail himself of his ingenuity in that respect."

"That is the reason why reissues often become necessary, because, in the original patent, the party did not claim distinctly the separate items of the property which he had a right to claim."

These views of Judge Woodruff came under the consideration of this court upon an application for a preliminary injunction in the cases of the complainant against Gill and against Yates [Case No. 17,393], and no reason was found then or now to dissent from their general correctness.

Holding, then, that the several claims of the reissue are warranted by the model and specifications on which the original patent was granted, and not regarding the validity of the Wells patent as any longer an open question in this court, I proceed to consider the alleged infringement, by the defendants.

But on the threshold of this inquiry we are met by the counsel of the defendants with the objection that the bill should be dismissed, because it charges the defendants with a joint infringement, and the proofs are that they were several.

To sustain this objection, the settled rule in equity is invoked that two or more distinct subjects cannot be embraced in the same suit.

But the principle does not apply where there is a privity or connection between the different defendants, in reference to the object or subject-matter of the action. The pleadings and proofs in this case reveal the fact that two of the defendants, Jacques and Duryee, were the owners of a number of the machines which are alleged to infringe the complainant's patent. They used them from the date of the suit in New York, to wit, August 20, 1868, until November 30, of the same year, when another defendant, the Newark Patent Hat-Body Company, by its president, John D. Mitchell, the son-in-law of Jacques, leased them, with other property of Jacques & Duryee, for the con-

sideration of fifty dollars per month. The large amount of property transferred by this lease to the corporation for so inadequate a sum; the reticence so apparent throughout the case as to the constituents of said corporation; the amazing ignorance manifested by Mr. Jacques in his examination in reference to it, and its formation so soon after the suit was commenced in New York against Jacques & Duryee, as infringers, all give weight to the suspicions of the complainant that the organization was a mere contrivance to escape responsibility.

But, without expressing any opinion on that point, it is a sufficient answer to the objection to observe that the defendant corporation took of Jacques & Duryee the machines complained of, and continued their use; and that if they were infringers at all, they shared with the lessors the fruits of the infringement; and that this relationship created such a privity between them as to render it proper to embrace them in the same suit.

I do not overlook the fact that, in the lease, they were called the Boyden patent hat-body machines, and that defendants' counsel insist that the court ought not to imply that any illegal or improper use was intended by the transfer. The court implies nothing; but the proof states that the precise machines transferred to the company, called by whatever name, were those whose use, the complainant alleges, was an infringement; and if that allegation is sustained, it will be no defence to show that they were known as the Boyden machines, and, in fact, contain the improvements known as the Boyden patent.

Have, then, the defendants infringed the Wells patent? They admit the use of the Boyden patent hat-body machines, but claim that they are protected in their use by the decree of the supreme court in Burr v. Duryee, 1 Wall. [68 U. S.] 531. It is true that the court there held that the Boyden patent for an improvement in machinery for forming hat-bodies was not an infringement of the Wells patent; but the case was tried and decided in reference to the Wells patent as it then existed. Since then there has been a surrender, amendments and corrections of specifications and claims, and a reissue; and, as I have already considered, that the claims of this reissue are not shown to have been added to or to have been different from the original invention, the complainant is at liberty now to test the validity of the Boyden improvement by comparing it with the claims of the last reissue of the Wells patent.

It will be observed that Boyden did not profess to invent a machine, but to improve an existing one; and his improvement related to a new "mode of directing or guiding the fur to the cone, whereby trunks and all other comparatively complicated appliances hitherto used for the purpose were dispensed with, and an exceedingly simple and efficient device substituted therefor."

In this single claim, he says: "I do not claim the cone or the picker; neither do I

claim the feed-apron; but I do claim as new the fur-director or plate F, curved or bent, substantially as shown and arranged, in relation with the cone B and picker D, to operate substantially as and for the purpose set forth."

Now, it may be conceded that the Boyden patent is all that the inventor claimed for it, as a new, useful, and patentable improvement, and yet its use may be an infringement, if it cannot, in fact, be operated except in connection with some of the combinations of the Wells reissue.

Upon this question the experts, as usual, differ. Mr. Waters, the complainant's expert, testifies that all the claims of Wells' patent are infringed by the machines used by the defendants. In order to reach this conclusion he treats the bottom board, the curved plate or fur-director, the tins or step-boards, of the Boyden machine, as mere mechanical equivalents for the bottom plate, the guides or deflectors, the side-guides, and the devices for guiding the fur fibre of the first, second, third, and fifth claims of the complainant's reissue. The defendants' expert, Mr. Hibbard, on the other hand, refuses to regard these devices of the two machines as equivalents; claims that the complainant is bound to use the trunk or tunnel with flap and hood, as exhibited in the model and described in the specifications, as an entirety, and is forbidden to separate the device into bottom plate, side guides, deflectors, etc., and distribute it into parts through her different claims. He further insists, and the whole theory of the defence seems to be based upon this, that there cannot be a patentable combination of a portion of the parts necessary to make up a complete machine, unless such distinct combination, acting independently of the other parts, will produce some new and practically useful result. This last proposition has been already considered, and reference is now made to it to afford the opportunity of observing that much of the testimony of the defendants' expert must be interpreted in reference to what the court holds to be this mistaken view of the law of the case.

If the first, second, fourth, and sixth claims of the complainant's reissue are patentable combinations, when construed in reference to the specification of the patent, as I hold them to be, and if Wells was the original inventor of these devices in combination, as there seems to be no reasonable doubt, I think the testimony in the case fully establishes the fact that the use of defendants' machines violates each of these claims, even if it should be held that Boyden's method of getting the fur from the picker to the cone and of distributing it upon the cone in proper quantities to make a merchantable hat-body was new and preferable to the trunk or tunnel of the Wells machine.

And this brings me to consider what was in issue in the suit of Wells v. Jacques before the jury in the circuit court in New York [case unreported], and how far the parties here ought to be concluded by that verdict.

An examination of Boyden's specifications to his patent clearly reveals how he distinguished the principle or mode of operation of his machine from the invention of Wells. Regarding the trunk or tunnel which conducted the aërial current, bearing the fur from the brush to the former, and, at the same time, regulated its distribution thereon, as the only new and patentable device of Wells, he dispensed with the trunk or tunnel, hood and flap, and claimed that instead of conducting the fur, he projected it by means of the strong current produced by the rapid revolution of the picker; that the fur was brought within the influence of the exhaust by projection and not conduction; that, by reversing the rotation of the picker, he caused the fur to be borne downward by the current until it struck the fur-director or plate, whose curved surface directed and regulated its proper distribution upon the cone; and, although the force of the current was somewhat interfered with and impeded by striking upon the bottom board, step-board, or tin guides, it was not sufficiently retarded to materially weaken the propulsion of the fur. His words are:

"The picker D, although of usual construction, is rotated in a reverse direction to those in ordinary machines. The fur from which the hat-bodies are formed is placed on the apron E, which conveys it as usual to the picker D. The picker, by its rapid rotation, conveys the fur around on the plate F, which, in consequence of being curved as described, causes the fur to be projected towards the cone B in a series of planes, * * * the velocity of the picker being sufficiently great to project the fur within the influence of the exhaust of the cone. This peculiar curve of the plate F, not only gives the proper direction to the fur, so that the latter may properly cover the cone, but it directs the fur to the cone in proper quantity, etc."

The complainant insists that such an attempt to distinguish between the projection and conduction of the fur-bearing current is chimerical; and that practically no such difference exists: that the reversal of the operation of the picker, causing the current to strike on the plate or deflectors below, is mechanically the same as the rotation of the brush in the opposite direction causing it to strike upon the upper part of the trunk and the hood above, and that the distribution of the fur in both cases is effected by substantially the same means.

This is a question of fact, and, as I understand it, was the question which Judge Woodruff submitted to the jury in Wells v. Jacques. In that case, tin guides were used as deflectors or distributers of the fur, and the jury found that they infringed the complainant's reissued patent. Since then the defendants have substituted the wooden step-board for the tins; and their expert, Mr. Hibbard, states that he considers the two substantially the

same, and the one no more an infringement than the other. The verdict of the jury on the question of fact certainly estops one of the defendants, Jacques, as to the tin guides; the uncontradicted admission of his expert equally concludes him as to the step-board being their equivalent; and, after a careful examination of the testimony in the present case, I can see no reason to dissent from the correctness either of the verdict or the judgment of the expert, and must hold all the defendants, outside of any question of estoppel, to be infringers of the complainant's reissue.

In the argument, the defendants' counsel treated the sixth claim of the complainant as for a process for hardening the hats after they are formed. If it were for that it would not be proper for this court to inquire whether the invention of the process belong to Ponsford or to Wells, as the supreme court has decided that question in Burr v. Duryee [supra]. But in the reissue the means for removing the hat from the cone is separated from the process of hardening; and the claim, fairly interpreted, is for the means, not for the process. Here, again, it is sufficient to say that in the testimony the opinion of the defendants' experts stands unquestioned; that, as regards the mechanical means by which the process is carried out, the claim of the complainant is not anticipated by Ponsford's English patent.

It is not conceived that the result to which I have arrived is in conflict with the views of the supreme court, as expressed in the case of Burr v. Duryee, supra, as the issues were there presented. It is both the duty and inclination of this court to accept the conclusions to which the court came. But the surrender, the amendments of the specification and claims, and the reissue of the Wells patent since then, have more completely exhibited the extent of Wells' invention, and have placed some of his separate patentable combinations in such a position as to enable the courts to grant to the owner of the patent that protection which they were unable to do under his original defective specifications and claims.

In the present case there must be a decree for the complainant for an injunction and account against all the defendants, except Duryee, whose plea has been accepted by the complainant as an excuse.

[For other cases involving this patent, see note to Burr v. Cowperthwaite, Case No. 2,188.]